IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 3, 2008 Session

## STATE OF TENNESSEE v. LARRY CARNELL PITTMAN

**Appeal from the Circuit Court for Madison County**
**No. 06-161    Roger A. Page, Judge**

**No. W2007-00589-CCA-R3-CD   -   Filed April 7, 2009**

In February 2006, the Madison County Grand Jury indicted the defendant, Larry Carnell Pittman, on one count of especially aggravated kidnapping, a Class A felony, one count of aggravated robbery, a Class B felony, and one count of conspiracy to commit aggravated robbery, a Class C felony. Following a jury trial, the defendant was convicted of all three counts of the indictment. The trial court sentenced the defendant to thirty-eight years as a Range II, violent offender for his especially aggravated kidnapping conviction, nineteen years as a Range II, multiple offender for the aggravated robbery conviction, and nine years as a Range II, multiple offender for the conspiracy to commit aggravated robbery conviction. The trial court ordered that all sentences be served consecutively. On appeal, the defendant argues that: (1) the trial court erred by failing to grant his motion to suppress evidence; (2) the trial court erred by failing to grant his motion for a continuance; (3) the evidence produced at trial was insufficient to support his convictions; and (4) the trial court imposed excessive sentences. After reviewing the record, we discern no error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Ryan B. Feeney, Selmer, Tennessee (on appeal); and Benjamin C. Mayo, Jackson, Tennessee (at trial), for the appellant, Larry Carnell Pittman.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; James G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

At trial, Officer Richard Newbill with the Jackson Police Department testified that at around 11:30 p.m. on November 27, 2005, he was dispatched to a robbery call at a Lone Star Steakhouse in Jackson. Officer Newbill said that he was the first police officer to arrive at the restaurant. Upon arriving at the restaurant, the officer interviewed the restaurant manager, Micki Rhodes, who had been present when the restaurant was robbed. According to Officer Newbill, the victim's demeanor was "shaken up" and "scared," but she was still able to relate that after the restaurant had closed, a man dressed in black and carrying a knife "grabbed her by the neck area and took her . . . to the office or wherever they keep the money" and had her remove the money from the safe. The assailant then placed the victim in the restaurant's walk-in cooler, where she remained for some time before calling 911. According to Officer Newbill, the victim said that the robber was wearing "[a] black ski mask, black like large-type black jacket, [and] black pants." Officer Newbill testified that he observed bruises on the victim's neck; the victim told the officer that she received those bruises when the robber grabbed her by the neck. The victim also said that the robber took approximately $5200 from the restaurant's safe.

On cross-examination, Officer Newbill said that in his police report, he indicated that the robbery occurred between 11:10 and 11:20 that evening. He said that in his report, he described the black mask the robber wore over his face as a ski mask, which was the description provided by the victim. He indicated that he did not recall whether the victim described the robber's black jacket as a "bomber jacket," and he also admitted that in his report he described the jacket as a "black jacket" rather than a "bomber jacket" or a "large black jacket." Officer Newbill initially said that the victim related that she had been locked in the cooler, staying there for ten to fifteen minutes, although the officer later said that the victim was not in the cooler when he arrived on the scene.

Officer Steven Story with the Jackson Police Department testified that he arrived at the restaurant with Officer Newbill. Upon arriving, Officer Story searched the restaurant while Officer Newbill began interviewing the victim. After Officer Story completed his search, he also spoke with the victim. He asked her if she recognized the robber. The victim said she did not. Officer Story then asked if anybody had been fired from the restaurant recently; when asked why he posed this question, Officer Story replied, "in my experience sometimes that's the way it happens. I've worked other robbery cases where that was the case." The victim replied that the defendant had been fired "about a week or so" before the robbery for drinking on the job. She stated that although the robber wore a mask over his face, preventing her from seeing the robber's face, the defendant "did match close to the description of this guy [who] had grabbed her." The victim related that the robber carried "a long knife"; Officer Story searched the restaurant, but none of the knives in the restaurant matched this description.

Officer Story said that the victim informed him that the robber "had on a black jacket, a black-type almost like a baseball cap, some type of mask over his face like a ski mask," black pants, and black gloves. Officer Story said that he did not ask the victim whether the robber resembled the defendant, but that the victim suggested the resemblance on her own.

On cross-examination, Officer Story said that the victim said that the color of the robber's mask "could have been a dark blue to a black." He also said that there was no indication that the victim suffered any injuries other than the bruising to her neck. The officer testified that he assumed that the robber took the knife used during the robbery with him when he left the restaurant. He also said that before he asked the victim about any employees who had been fired, the victim said that she was unable to recognize the robber.

Micki Moody, who was known by her maiden name of Micki Rhodes at the time of the incident, testified that she was the manager on duty at the Lone Star Steakhouse the night of November 27, 2005. She said that after the restaurant closed that night, she counted the day's receipts in the office. While she did that, the last two kitchen employees informed her that they were done working and were leaving the store. She walked into the restaurant's dining room, and after seeing the two employees leave, she returned to the office to finish her closing duties. She then returned to the dining room, where a man with a knife grabbed her and started pushing her toward the office. Moody said that the knife had a black handle and a blade that was eight to nine inches long. She testified that she screamed and "fought a little" with the assailant until he wrestled her onto the ground. The assailant then grabbed Moody by the neck and demanded the restaurant's money. The assailant then held her by the neck and turned her toward the restaurant's safe. She opened the safe, and the assailant took all the money from the safe. After taking the money, the assailant grabbed Moody by the neck and led her from the office. The two then went into the kitchen, where the assailant opened the door to a walk-in cooler and pushed Moody inside. Moody testified that she remained in the cooler for five to ten minutes before exiting the cooler and calling 911 from the office phone.

Moody testified that when the assailant confronted her, she had already counted the money the restaurant had taken in that day and prepared it for deposit. She said that this money, as well as the previous day's deposit and the money the restaurant generally kept on hand to make change in the normal course of business was stolen from the safe. Moody said that the restaurant's bank account was with First Tennessee Bank; she noted that "if [the restaurant] get[s] any change made from the bank . . . like a hundred dollars worth of ones or something[,] they wrap [the money] in a band that would say First Tennessee." She testified that some of the money taken from the safe was bundled in this manner. Moody said that she and the restaurant's general manager, who arrived at the restaurant after the police arrived, concluded that the assailant took approximately $5100 from the safe.

Moody said that she looked at the robber "somewhat" during the incident. She described the man's clothing as "completely black. At the first glance I know it was black pants, [and] a black jacket . . . [with] big pockets on the side and big buttons." She also noted that the assailant wore "a black mask of some kind," a black hat, black gloves, and black tennis shoes which had "no descriptive marks." She said that some time after the robbery, she met with Jackson Police Department Investigator Tyreece Miller, who showed her photographs of certain articles of clothing and bundles of money. These photographs were introduced into evidence at trial. Moody identified the black jacket, black pants, black shoes, and black gloves depicted in the photographs as the same ones that the assailant wore the night of the robbery. She said that the black hat and mask depicted in the photographs were "consistent" with the type of clothing worn by the assailant, but she could

not say for certain that these items were the ones worn by the assailant.

Moody said that the money shown in the photographs was the money that was stolen from the safe the night of the robbery. She noted that the photographs depicted money bundled in paper bands marked "First Tennessee," which was the bank Lone Star used for its deposits. She also said that some of the money in the photographs was bundled with paper clips, which was consistent with Lone Star's business practice of bundling $25 in one-dollar bills with paper clips.

Moody testified that the defendant had been employed with Lone Star as a grill cook for approximately one year before being fired. She said that the defendant would have been familiar with the layout of the restaurant, including the office, kitchen, and cooler. She said that the assailant did not hesitate in leading her from the office to the cooler. Moody said that the assailant did not lock the cooler door when he placed her there, so she was able to escape on her own. She said she remained in the cooler for some time because she was unsure when the assailant would leave the restaurant.

Moody said she described the assailant's build to the police. She described the assailant as "tall, kind of broad shoulders. I don't know if I would stay stocky but, you know, not thin." She said that the robber's build was consistent with the defendant's build. She also said that she was able to hear the robber's voice, and based on the voice, she presumed that the robber was black and sounded as if he were in his forties or fifties. Moody testified that Story asked her if the defendant fit this description, and she replied that he did. However, she reiterated that her description of the robber's clothing and build, as well as her assumptions regarding the robber's race and age, were formed before the police asked her about anyone being fired from the restaurant.

Moody testified that the last two employees to leave the restaurant the night of the robbery were a dishwasher, Josh Irvin, and a cook, Lineal Green. She said that the kitchen workers were responsible for locking the restaurant's back door once they finished taking out the garbage. She said that Irvin, who she believed was eighteen years old, had worked at the restaurant for a few months before the robbery. She said that Irvin knew the defendant because the two men worked together at the restaurant. She said that Irvin left the restaurant approximately five minutes before the robbery and that Irvin was making a call on his cellular telephone as he left the restaurant.

On cross-examination, Moody admitted that she initially told Officer Story that she did not recognize the assailant. She also said that after Officer Story asked her about anyone being fired from the restaurant, the officer asked if the defendant fit her description of the assailant. Moody said that during the year the defendant worked at the restaurant as a grill cook, she spoke with him on several occasions. She admitted that although she would have had "ample opportunity to be familiar with his voice," she was unable to tell the police that she recognized the assailant's voice as the defendant's.

Moody said that Irvin "clocked out" of the restaurant at 11:11 p.m. that evening, while the other person working in the kitchen that night, Lineal Green, clocked out at 11:03 p.m. She admitted that Irvin was "basically tall, broad-shouldered, [and] not stocky," and that this description was consistent with the physical description of the assailant that Moody gave to police. She admitted that

when she dialed 911 to report the incident, she told the dispatcher that she believed the assailant was black, despite the fact that she did not see the assailant's face.

Regarding the assailant's clothing, Moody said that although in the 911 call and her preliminary hearing testimony she identified the robber's mask as a ski mask, she was unsure whether the mask was actually a ski mask. Moody described a ski mask as "a cloth mask that has the eyes and only the mouth cut out of it." She also said that although she described the assailant's jacket as a bomber jacket to police, she admitted that she "[did not] know exactly what a bomber jacket [was]." She also admitted that at the time of the incident, she was unable to provide any identifying features regarding the assailant's shoes. She also noted that workers at Lone Star wear blue jeans and a black t-shirt with the restaurant's logo on it and that workers in the kitchen also had the option of wearing black pants.

On redirect examination, Moody said that at the time of the robbery, she was uncertain of the assailant's identity, but after becoming "privy to other evidence in this case," she believed "unequivocally, beyond a reasonable doubt" that the defendant committed these offenses. She said that she saw the assailant approximately twenty seconds during the incident. She insisted that the jacket depicted in the photograph she was shown by police the day after the incident was the one the assailant wore during the robbery. She also reiterated that the assailant's voice sounded like that of an "older" African American man, which was consistent with the defendant and not consistent with Irvin. On recross-examination, Moody said that she could identify a black man by his voice.

Sergeant Robert Henson with the Jackson Police Department testified that the evening of the robbery, he responded to a radio dispatch concerning the robbery at the Lone Star restaurant. He first went to the restaurant, where he became aware of the details of the offense, including the suspect's physical description, which Sergeant Henson described as "a black male dressed all in black, wearing a black ball cap with a black jacket with large pockets with snaps on them." After Investigator Miller arrived, Sergeant Henson left the restaurant to continue his patrol shift, which was scheduled to end at 1:15 a.m.

Sergeant Henson testified that around the time his shift was to end, he was driving west on Ridgecrest Road near the intersection of Highland Avenue when he observed a man pushing a bicycle up a hill. Sergeant Henson testified that the man "matched the description" of the suspect in the robbery. Specifically, Sergeant Henson described the clothing as "a black ball cap, dark colored pants, and a black coat. What drew my attention was the pockets with the snaps on them." After passing the suspect, Sergeant Henson put out a radio call "to see if [there] were any units close so we could stop the subject and check him." Officers McMullen and Cole responded that they were in the area. Sergeant Henson turned back toward the individual, who by this time was riding his bicycle eastbound on Ridgecrest. Sergeant Henson and the two officers then "pulled over and stopped" the individual, whom Sergeant Henson identified in court as the defendant.

Sergeant Henson testified that when he and the other officers approached the defendant, he asked the defendant where he was coming from. Sergeant Henson noticed that the defendant was sweating, appeared nervous, and kept placing his hands in his pockets. The officers told the defendant to refrain from putting his hands in his pockets because they were concerned over the

defendant possibly having weapons in his pockets. After a while, Officer Cole approached the defendant from behind and patted him down for weapons. During the search, Sergeant Henson saw the defendant's coat open up, at which point he observed "a large bulge in the front of his shirt that was kind of squared looking and I told Officer Cole about it." Officer Cole placed his hand on the bulge and "asked him what it was," to which the defendant replied that it was "his money." The officers discovered a black plastic bag containing some money, and Officer Cole took possession of the bag. Sergeant Henson testified that the police also found black gloves in one of the defendant's pockets.

On cross-examination Sergeant Henson said that while he was at the restaurant, he had overheard Moody describing the jacket as a black jacket with pockets that snapped. He said he had no idea why this description was not recorded in the 911 call or in any other police report.

Officer Edward McMullen with the Jackson Police Department testified that he was one of the two officers who responded to Sergeant Henson's call to assist with stopping the suspect. He said that he and Officer Cole, driving separate cars, arrived at the location where Sergeant Henson had observed the suspect. Officer McMullen recalled that he was the last officer to arrive on the scene, and by time he arrived, the other two officers were already speaking to the suspect, who was wearing a black leather jacket, black pants, and black sneakers. Officer McMullen saw Officer Cole pat down the suspect for weapons. He then saw Officer Cole grab a "large bulge" in the suspect's jacket or shirt, a bulge which turned out to be a bag containing "a large sum of money." Officer McMullen said that some of the money was wrapped in "bank bands." He testified that the suspect, whom he identified in court as the defendant, was transported to the local jail, where his clothing was collected as evidence. The clothing, which was admitted into evidence at trial, included a black leather coat, two black "winter gloves," a black leather cap, a navy "long john" shirt, black jogging pants, a pair of navy blue polyester pants, black tennis shoes, a black t-shirt, black socks, a black belt, and two "stocking-type skullcaps." Officer McMullen said that the skullcaps to him looked like "a portion of . . . dark-colored pantihose." Officer McMullen said that the police also retrieved two wallets from the defendant, one of which was his, and the other containing "half of a driver's license" belonging to a white male.

On cross-examination, Officer McMullen said that at night, he would have been unable to see whether the defendant's jacket pockets had snaps on them. He also said that he would not have described the defendant's jacket as a bomber jacket. Officer McMullen said that there was no writing on the hat the defendant was wearing at his arrest. He explained that the mask recovered from the defendant did not have cutouts for a person's eyes and mouth, as would a ski mask.

Officer Royal Cole with the Jackson Police Department testified that he assisted Sergeant Henson and Officer McMullen in apprehending the suspect the morning after the robbery. The substance of his testimony largely mirrored that of the other two officers. Regarding the bulge in the defendant's shirt, Officer Cole testified that as he stood behind the defendant, patting him down for weapons, he noticed a "large bundle," which he thought may have been a bomb. Officer Cole discovered that the object was a bag of money, which he turned over to Investigator Miller once he arrived on the scene. He recalled that some of the money was wrapped in bank bands and some was bundled with paper clips.

On cross-examination, Officer Cole testified that before he received the call from Sergeant Henson regarding the suspect, he received a general "be on the lookout (BOLO)" call regarding the robbery at the restaurant. He said that the description of the suspect in the initial call was that of a man dressed in black. Officer Cole said he was uncertain whether the defendant was nervous or agitated because the police were "hassling" him. Officer Cole described the bundle he felt in the defendant's clothing was "medium," neither hard nor soft. The officer said that the bulge did not feel like a gun or a knife, and he also admitted that he did not know what a bomb felt like, or what it ought to feel like.

Investigator Tyreece Miller with the Jackson Police Department testified that while he was at the restaurant interviewing Moody, he received a call from Sergeant Henson stating that he had detained the defendant, who was carrying a large amount of money. After concluding his interview with the victim, Investigator Miller went to the scene where the three Jackson police officers were detaining the defendant in the back of a police car, a site which the investigator said was approximately 2.3 miles from the restaurant. Officer Cole handed Investigator Miller a black bag containing a large amount of money, some of which was bundled in First Tennessee bank wraps. He then told the officers to transport the defendant to the police station, which they did. Investigator Miller said that "in the early morning hours" of November 28, 2005, he photographed the money that had been taken from the defendant. He noted that in addition to being wrapped in paper bands labeled with the First Tennessee name, some of the money was bundled with paper clips, a practice which Moody had described. Investigator Miller said that he recovered $4768 from the bag found on the defendant at his arrest.

Investigator Miller testified that in the defendant's wallet, the police located a piece of paper with a phone number and the name "Josh" written on it. In the course of his investigation, after the police made Irvin a suspect, Investigator Miller became aware of cellular phone calls that the defendant and Irvin had made between one another.

On cross-examination, Investigator Miller said that he wrote down Moody's statement. In the statement, Investigator Miller wrote that the assailant wore a bomber jacket with silver buttons and big pockets. However, he admitted that the jacket worn by the defendant at the time of his arrest did not have silver buttons on it. He also said that he did not consider the mask recovered from the defendant to be a ski mask, and he did not consider the defendant's jacket to be a bomber jacket, although Moody described the mask and jacket as such. He also said that the defendant's hat had no writing on it, despite the victim's statement that the assailant's hat could have "possibly" had yellow writing on it. Regarding the discrepancy between the amount of money the restaurant manager said was taken from the store and the amount found on the defendant, Investigator Miller said he was unsure as to why the discrepancy existed. He surmised that either the manager was mistaken about the amount of money taken or the defendant could have hidden or lost some of the money.

Investigator Miller said that the police developed Irvin as a suspect after the police received a call in which a complainant stated that "Irvin had made a comment to one of his employees that he knew that Lone Star was going to get robbed before it was robbed." Investigator Miller said that Irvin was indicted in this case but pled guilty to lesser charges. Investigator Miller said that he

-7-

interviewed Irvin three times and that Irvin provided "a little bit of the truth" during each interview.

On redirect examination, Investigator Miller said that he believed that Irvin told him the truth regarding the defendant's involvement in the robbery. He also said that the differences between Moody's description of the assailant's clothing and the clothing the defendant was wearing at the time of his arrest did not lead him to doubt Moody's credibility or exclude the defendant as a suspect. On recross-examination, Investigator Miller said that Moody initially told him that the assailant was wearing a black jacket. Investigator Miller asked Moody for more information, at which point she said that the defendant was wearing a bomber-style jacket with big pockets and silver buttons. He also said that Irvin was not identified as a suspect the night of the incident, and that Irvin later admitted his involvement in the Lone Star robbery.

Josh Irvin testified that in November 2005, he was employed as a dishwasher at the Lone Star Steakhouse in Jackson. In addition to washing dishes, he would take trash to the restaurant dumpster. Irvin said that when he took trash to the dumpster, he would prop the restaurant's back door open so he would not be locked out of the restaurant. Irvin said that the defendant, who had worked at the restaurant as a grill cook before being fired, was familiar with this procedure and with the layout of the restaurant.

Irvin testified that on the evening of November 27, 2005, while at work, he received a phone call from the defendant. In that call, the defendant informed Irvin that he was going to rob the restaurant and asked for Irvin's assistance. Irvin said that although the defendant's plan was "on [his] mind," he did not tell anyone at the restaurant about the defendant's plans. Irvin testified that he and the defendant placed "several calls back and forth." In one of the calls, the defendant told Irvin that he (the defendant) was on his way to the restaurant on a bike. In another call, which Irvin said took place after Moody clocked him out, the defendant asked Irvin how many people remained in the restaurant. Irvin responded that he, Green, and Moody were the only three people remaining in the restaurant. He further told the defendant that he and Green[1] were leaving the restaurant at that point.

Irvin testified that he pled guilty to facilitation of aggravated robbery and conspiracy to commit aggravated robbery. He said that he received an effective ten-year judicial diversion sentence, which included an eighteen-month sentence at the Madison County Penal Farm and the rest of the sentence on probation. Irvin confirmed that his criminal record could be expunged if he did "exactly what [he was] supposed to" do as part of his sentence, which included testifying against the defendant.

Irvin testified that when he took out the trash that evening, he left the back door propped open. He also said that after he and Green left the restaurant, he left his hat wedged inside the front door so that the door would not lock. He and Green waited five to ten minutes for Irvin's stepfather, who agreed to give Green a ride home before taking Irvin home. After Irvin's stepfather agreed to

---

[1]Investigator Miller testified that Green was subpoenaed to testify at trial. However, Investigator Miller said that he was unsure whether Green had been served with the subpoena and did not know Green's current whereabouts.

give Green a ride home, Irvin went to the front door to retrieve his hat. At that time, he looked inside the restaurant, where he saw a man wearing a dark jacket and a mask over his face standing against a wall and looking "into the office door." Irvin said that he did not tell anyone about this person's presence in the restaurant.

After Irvin's stepfather picked up Irvin and Green around 11:15 p.m., they went to a Walmart located behind the Lone Star restaurant. Green and Irvin stayed near the front of the store while Irvin's stepfather went shopping in the store. After a while, Irvin heard sirens and saw police officers arrive. He and Green spoke to a police officer, who informed them that the Lone Star had just been robbed. This information prompted Irvin to call the defendant, who told Irvin that "he was long gone from Lone Star and that he was near the country club," which Irvin said was near the intersection of Highland Avenue and Vann Drive in Jackson. Irvin testified that after he and his stepfather arrived at their home shortly after midnight, he called the defendant again on his cellular phone. The defendant said that he needed a ride, which Irvin said he was unable to provide, given that he had already returned home.

On cross-examination, Irvin admitted that in June 2005, he was fired from his job at a Corky's restaurant because the manager had suspected Irvin of taking money from the restaurant. Irvin said that he was unsure whether he listed this employment on his Lone Star application, but he was certain that he did not mention his Corky's termination on the application.

Irvin recounted the eight phone calls between him and the defendant the evening of November 27 and the early morning of November 28. Irvin admitted that although he was "concerned" over the defendant's initial phone call to him around 4:30 p.m., in which the defendant outlined his plans to rob the restaurant, Irvin told nobody about the defendant's plans. He also said that he did not remember what he and the defendant talked about when he called the defendant at 5:37 p.m. Irvin said that when the defendant called him at 9:34 p.m., the defendant said that he was on his way to the restaurant on a bicycle. Irvin said that the defendant called him at 10:30 p.m., but Irvin did not recall the substance of that conversation. Irvin said that after this call, he called the defendant four times. At 10:59 p.m., he called the defendant but received no answer. At 11:08 p.m., the defendant asked Irvin how many people remained in the restaurant. Irvin called the defendant twice more after the robbery, at 11:26 p.m. and 12:05 a.m. Irvin said that he was unsure why he made these last four phone calls, though he said that perhaps he was "curious." Irvin also said that he made three phone calls to his house between 10:56 p.m. and 11:49 p.m., and that his mother called his cellular phone once during that period. Irvin also noted that at 11:38 p.m., he called an unknown number. He initially said that he was unsure to whom the phone number belonged, but on redirect examination, he said that while he was waiting for his stepfather to finish shopping at Walmart, he called a girl he knew.

On redirect, Irvin also said that he had occasionally given the defendant a ride home from Lone Star while the two were employed there, and during the rides home, the two talked about grilling because Irvin eventually wanted to become a cook. Irvin said that he and the defendant became friendly, and based upon his "allegiance" to the defendant, his friend, he did not warn Moody about the defendant's robbery plans. Irvin said that he received no money from the defendant as part of the robbery, nor was he promised any money. Irvin reiterated that although he

-9-

called the defendant as he was leaving the restaurant, the defendant asked Irvin about the people remaining in the restaurant. He also admitted that in his earlier statements to police, he was not entirely truthful. On recross-examination, Irvin admitted that in a December 5, 2005 statement to police, he had said that he had clocked out himself, which was not true. He also said that he provided police with incorrect times for the phone calls between him and the defendant, and he also lied to police about who initiated some of the calls.

Elvis Love, Irvin's stepfather, testified that he picked up Irvin and Green from the restaurant the night of the robbery. He said that he, Green, and Irvin went to Walmart, where he shopped while Green and Irvin waited near the front of the store. After Love finished his shopping, he dropped off Green at his house and then returned home. On cross-examination, Love said that he was unsure what time he picked up Irvin and Green from the restaurant, and he was also unsure how long he was at Walmart.

The defendant testified that he was employed at Lone Star for about one year as a grill cook. He said that he knew Irvin "for a few months," and that they had given each other rides home from the restaurant several times. The defendant offered his own account of the eight telephone conversations between him and Irvin that occurred the night of the robbery. He said that he placed the first call to Irvin at 4:29 p.m. The defendant said that Irvin had called him several days before the robbery asking about why he was terminated, and that the defendant was returning Irvin's call. He said that Irvin called him later that evening asking for a ride home. The defendant said that he called Irvin twice, at 9:34 and 10:30 p.m. The defendant said that both times, he was returning Irvin's call. He noted that Irvin called the defendant four times between 10:59 p.m. and 12:05 a.m. because Irvin "needed a ride real[ly] bad[ly]." The defendant insisted that he did not offer Irvin a ride home at any time that evening.

The defendant said that when he was stopped while riding his bicycle on Ridgecrest Road, he was "exercising." He said that he was wearing a black leather cap, a black leather coat, black jogging pants, and black tennis shoes. The defendant said that he was approached by "about five police cars," and that the officers "bum rushed" and tackled him. The defendant said that the police took his clothing and that the clothing introduced into evidence at trial was the clothing he was wearing at his arrest. He insisted that his black jacket was not a bomber jacket and that it did not have silver buttons or snaps on its pockets. He said that his black leather hat had no writing on it, and he said that the police did not recover a skullcap, which he described as a stocking cap to keep his hair in place. Rather, he described the cap recovered by police as a stocking cap.

The defendant testified that the money the police took from him was a combination of his own money and some money that he had found in a used car lot. He said that the money he found in the bag was not bundled with paper clips or bank wraps. The defendant said that he told the police that he won the money gambling, but he admitted that this statement was a lie. The defendant accused Investigator Miller of threatening his life when the police interviewed him. He insisted that he did not rob the Lone Star restaurant or attack Moody, and he also stated that he did not know who Green was.

On cross-examination, the defendant said that he started his bicycle ride a few minutes after

11:00 p.m. He said that the police took $2200 of the defendant's money from his pockets and placed this money in the bag with the money he had found in the used car lot. The defendant insisted that he kept his money in his possession because he did not keep his money in a bank and he did not want to risk losing his money in a house fire. Regarding the "found money," the defendant said that while riding his bicycle, he observed a car make a U-turn, during which time a passenger in the car threw a dark plastic bag out the car window. Upon arriving at the discarded bag, he observed a wallet next to the bag, which led the defendant to look inside the bag and discover that the bag contained money. The defendant insisted that the money was not bundled in any way. The defendant said that he told the police that he had won the money gambling because he surmised that if the police believed this story, the police would not seize his money.

The defendant said that he was in possession of two stocking caps at the time the police confronted him. He wore one on his head and kept another in his pocket. The defendant explained that he was "a black man. Black people wear stocking caps all the time. . . . I was raised up wearing one to try to keep my hair looking neat." The defendant said that the police did not tell him to keep his hands out of his jacket pockets. Rather, the defendant insisted that upon seeing him, the police tackled him. The defendant said that he originally told police that he won the money in his possession gambling, but in a subsequent statement that was transcribed by police, the defendant said that he found the money. He also insisted that while the written statement noted that the defendant was walking his bicycle up a hill when the police stopped him, he told police that he was riding his bike when the police stopped him. The defendant admitted that he signed the written statement, but he also said that perhaps he "misread" the statement before signing it. He also accused the police of keeping him in jail for three days before taking his statement.

Testifying as a rebuttal witness for the State, Investigator Miller said that he read the defendant his Miranda rights before the interview which produced the defendant's written statement, in which the defendant said that he was walking his bike at the time the police stopped him. He also said that the defendant indicated he understood those rights and waived them. Investigator Miller said that the defendant was not kept in jail three days before being interviewed by police. Rather, the interview took place around 5:50 the evening of November 28, the day after the robbery. On cross-examination, Investigator Miller said that he wrote out the statement, but he had the defendant review the statement for inaccuracies. Investigator Miller said that the defendant made a few revisions before signing the statement at 6:30 p.m. on November 28. On redirect examination, Investigator Miller said that he was unaware that the defendant had ever claimed that $2200 of the money found in the defendant's possession was the defendant's own money.

The jury convicted the defendant of one count of aggravated robbery, one count of conspiracy to commit aggravated robbery, and one count of especially aggravated kidnapping, as charged in the indictment. The defendant subsequently filed a timely notice of appeal.

ANALYSIS

I. Motion to Suppress

The defendant first contends that the trial court erred by not granting his motion to suppress

evidence, including his clothing and money recovered from his person, which resulted from what the defendant claims was an unlawful search and seizure. The crux of the defendant's argument is that the police had no probable cause to detain the defendant at the time he was stopped and ultimately searched. The State contends that because the search and seizure were permissible, the trial court properly denied the defendant's motion to suppress. We agree with the State.

*Suppression Hearing Testimony*

At the suppression hearing, both Sergeant Henson and Officer Cole testified, with the substance of each officer's testimony largely mirroring that of the testimony each man would give at trial. However, in addition to stating that the defendant matched the physical description of the suspect as provided by Moody, both officers testified that the defendant provided his name to the police before they began searching him. When asked on cross-examination, "what did you say to [the defendant] when you first exited the patrol car," Sergeant Henson said that he "started out just by asking for his name." Officer Cole, who was called as a defense witnesses, said that "at some point in the very beginning" of their interaction with the defendant, the police asked the defendant his name, which he provided. Both officers testified that the defendant had been identified as a person who had been fired from the restaurant where the robbery occurred. Both officers testified that they were aware that the victim had reported the assailant using a knife, so when the defendant kept placing his hands in pockets after being told to stop, the police decided to search the defendant for weapons.

At the conclusion of the hearing, the trial court denied the defendant's motion to suppress. The trial court found that the initial police stop of the defendant was proper in that the description of the suspect given by Moody "sufficiently matched this [d]efendant such that there were articulable facts such that reasonable suspicion was here, so that [the] stop was justified under the Terry case." The trial court further held that the officers' search of the defendant was justified given the officers' "credible" testimony that "Mr. Pittman [was] agitated and constantly putting his hands in his pockets. . . . [A]ny reasonable officer is going to be concerned in a situation like this because they knew that this person who robbed the Lone Star was armed with a knife . . . ." The trial court concluded its findings by stating that "once that was done and the money was found matching the description that had been given to the officers concerning what was taken from the restaurant along with all the other parts of the description of the suspect that matched up, I believe the arrest was also proper."

*Standard of Review*

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the

suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, an appellate court's review of the trial court's application of law to the facts is conducted under a de novo standard of review. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citations omitted).

Both the federal and state constitutions offer protection from unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971) (quoting Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007). "Exceptions to the warrant requirement include searches incident to arrest, plain view, hot pursuit, exigent circumstances, and others, such as the consent to search." Berrios, 235 S.W.3d at 104 (citing State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2005)). Fourth Amendment concerns attach to "all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S. Ct. 2574, 2578 (1975) (citation omitted); see Terry v. Ohio, 392 U.S. 1, 16-19, 88 S. Ct. 1868, 1877-79 (1968)).

Additionally, our supreme court has held that "a police officer may make an investigatory stop when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997) (citations omitted); see also Terry, 392 U.S. at 21. Our supreme court has also noted,

> In determining whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances. United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed.2d 621, 629 (1981). This includes, but is not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. Id., 449 U.S. at 418, 101 S. Ct. at 695, 66 L. Ed. 2d at 629. A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him. Terry, 392 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906.

State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). "Likewise, a frisk is warranted under Terry if the police officer has a reasonable suspicion based on specific and articulable facts that the suspect is armed." Bridges, 963 S.W.2d at 492 (citing Terry, 392 U.S. at 27).

In this case, Sergeant Henson learned through his interaction with the victim that the assailant who robbed the Lone Star Steakhouse carried a knife and was dressed entirely in black, wearing a jacket with large pockets. He also learned that the victim identified the defendant as a person who had been fired from the restaurant recently. While on patrol after leaving the restaurant, he observed a man dressed entirely in black wearing a jacket with large pockets. When Sergeant Henson and Officers Cole and McMullen stopped the man, they asked for his name. Upon hearing the defendant identify himself, the police continued questioning him. When the defendant continued placing his

hands in his pockets, even after the police requested that he stop doing so, the police, based on information that the assailant had used a knife during the robbery, conducted a "pat-down" for weapons. When the officers felt a bulge in the defendant's clothing, the police asked the defendant about the bulge. The defendant replied that the bulge was "his money," a statement which gave the police probable cause to conduct a full search and take the money from the defendant. In light of the totality of the circumstances, we conclude that the police had reasonable suspicion to detain the defendant, and that their search of the defendant was permissible under Terry and related cases. Concluding that the trial court did not abuse its discretion in denying the defendant's motion to suppress, we deny the defendant relief on this issue.

## II. Denial of Defendant's Motion for Continuance

The defendant next argues that the trial court erred by failing to grant his motion for continuance, which he filed the day the trial began. The State argues that the defendant has waived this issue on appeal for failing to include it in his motion for new trial. If not waived, the State argues that the trial court did not abuse its discretion by refusing to grant the continuance.

The State correctly notes that the defendant did not raise this issue in his motion for new trial. As such, the issue is waived on appeal and the defendant is limited to plain error review. See Tenn. R. App. P. 3(e); Tenn. R. Crim. P. 52(b). In determining whether plain error review is appropriate, the following factors must be established:

> (a) [T]he record . . . clearly establish[es] what occurred in the trial court;
> (b) a clear and unequivocal rule of law [has] been breached;
> (c) a substantial right of the accused [has] been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). On appeal, the defendant has the burden of establishing that these five factors are met. State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007) ("Gomez II") (citing State v. Bledsoe, 225 S.W.3d 349, 355 (Tenn. 2007)). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283. Our review of the plain error factors leads us to conclude that plain error relief is not warranted in this case.

The record does accurately reflect what occurred in the trial court regarding this issue. On October 4, 2005, the morning the trial was scheduled to begin, the defendant filed a motion for continuance based upon two letters Moody received at the Lone Star restaurant on October 3. The letters were sent in the same envelope, which bore the return address of the Federal Bureau of Investigation's (FBI) Memphis office and was purportedly sent by "Mr. Philip W. Thomas, Special Agent in Charge." The envelope was addressed to Micki Rhodes (Moody's maiden name) at the "Lone Statr [sic] Steakhouse." One of the letters, which was unsigned and addressed "To whom it may concern," was purportedly sent by Sergeant Henson on what the defendant claimed to be Jackson Police Department stationery. In the letter, the author admitted to falsifying evidence against the defendant. In the other letter, purportedly sent by Special Agent Thomas on FBI

-14-

stationery, the author claimed that the FBI was conducting an investigation related to the police investigation in this case. The letter also warned "anyone testifying in court" against committing perjury, which the author described as "not only a material crime, [but also] a[n] immoral act that can lead to the disruption and miscarriage of justice." This court's review of the letters reveals that both letters contain spelling and grammatical errors.

At the hearing on the continuance motion, Investigator Miller testified that the letter purportedly from Sergeant Henson was printed on letterhead that was not consistent with the actual letterhead used by the Jackson Police Department. Specifically, Investigator Miller said that the letterhead on which the letter to Moody was written lacked the name of the Jackson mayor and police chief, and he also noted that the Jackson Police Department letterhead did not have the images of the Jackson city seal and a Jackson police badge, as seen on the letter sent to Moody. Sergeant Henson testified that he did not write the letter or send it to Moody. Regarding the letter purportedly from the FBI, Special Agent Todd McCall testified that the letterhead used in the letter sent to Moody was "not even close" to that which the FBI uses. A letter sent by Special Agent McCall to Jackson Police Chief Richard S. Staples and written on official FBI letterhead was admitted into evidence. The official FBI letterhead contains the FBI shield and the phrase "U.S. Department of Justice," neither of which is present on the letter sent to Moody. Special Agent McCall also testified that the "envelope that this [letter] allegedly was contained in . . . is not of the format used by the Department of Justice or the Federal Bureau of Investigation." He noted that Special Agent Thomas had not been employed by the FBI since July 2003. At the end of the hearing, the trial court denied the defendant's motion for a continuance, ruling that the letters were "a fabrication, based on the evidence I've heard." The court also ruled that the letters could not be referenced at trial.

However, the defendant cannot establish that a clear and unequivocal rule of law has been breached in this case. The Tennessee Supreme Court has held that "[t]he trial court's denial of a continuance will be reversed only if it appears that the trial court abused its discretion to the prejudice of the defendant." State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004) (citing State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied [the] defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." Hines, 919 S.W.2d at 579 (citing State v. Wooden, 658 S.W.2d 553, 558 (Tenn. Crim. App. 1983)). In this case, the defendant has not shown proof of either criterion for establishing an abuse of discretion regarding a continuance. The defendant argues that the testimony at the hearing on the continuance motion was "one-sided" given that the only witnesses were law enforcement officials, but the defendant has offered no proof regarding potential witnesses whom he could have called and the testimony they could have offered. Furthermore, at trial the defendant extensively cross-examined the testifying Jackson police officers regarding the evidence the police collected from the defendant and the manner in which the evidence was collected—i.e., the substance of the letters. As such, the defendant has not established that he was prejudiced by the trial court's denying the continuance. The defendant is therefore denied relief on this issue.

### III. Sufficiency of Evidence

The defendant next argues that the evidence produced at trial was insufficient to support his

convictions. In his brief, the defendant does not address the evidence as it relates to the elements of the offenses for which he was convicted. Rather, the defendant's sole argument regarding this issue is that the evidence was insufficient to establish beyond a reasonable doubt that he actually committed these offenses. We disagree.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

As stated above, the defendant's sole contention regarding the sufficiency of the evidence is that the evidence was insufficient to establish the defendant as the perpetrator. "[T]he identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). This court has consistently held that "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)); see also State v. Hill, 987 S.W.2d 867, 870 (Tenn. Crim. App. 1998); State v. McMahan, 614 S.W.2d 83, 85 (Tenn. Crim. App. 1981).

In this case, Moody, the restaurant manager, testified that a man dressed in black robbed her, and while she did not see the man's face, she testified that the defendant's build was consistent with the assailant's. The victim identified most of the clothing recovered from the defendant following his arrest as clothing worn by the assailant, and she said that other clothing recovered from the defendant was "consistent" with the assailant's clothing. She also testified that money kept at the Lone Star restaurant was often wrapped in bank slips bearing the name of First Tennessee Bank, where the restaurant maintained its account, or bundled with paper clips. Some of the money recovered from the defendant at the time of his arrest was bundled with First Tennessee bands or paper clips.

The above evidence was supported by the testimony of Josh Irvin, who assisted the defendant in committing these offenses. Irvin testified that throughout the evening of the robbery, he and the defendant made several cellular phone calls between each other. In the first call, the defendant

informed Irvin that he intended to rob the restaurant. In later calls, the defendant informed Irvin that he was approaching the restaurant on a bicycle and asked Irvin how many people remained in the restaurant. Irvin testified that as he was leaving the restaurant, he saw in the restaurant a man dressed in black. At the time he was stopped by police, the defendant was dressed in black and either pushing or riding a bicycle.

The defendant argues that Irvin's testimony is unreliable given his inconsistent statements to police, his termination from a previous restaurant job, and the fact that his testimony was offered pursuant to a plea agreement, and the defendant also argues that Irvin's physical description matches that of the assailant. Despite these facts, the jury still chose to accredit Irvin's testimony, as was within its province as trier of fact. The defendant also argues that the clothing recovered from the defendant was only "in the most general sense . . . similar to that of the robber," but after listening to the testimony, which included extensive cross-examination of police witnesses regarding the particular types of clothing recovered from the defendant, the jury chose to discredit this argument through its guilty verdict. The evidence produced at trial was sufficient for the jury to conclude beyond a reasonable doubt that the defendant was the person who robbed the Lone Star Steakhouse the night in question. Accordingly, the defendant is denied relief on this issue.

## IV. Sentencing

On appeal, the defendant argues that the trial court imposed excessive sentences for his individual sentences, and that the trial court erred by imposing consecutive sentences. After reviewing the record, we conclude that the trial court committed no error in sentencing the defendant.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, on appeal the burden is on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991); State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

*Length of Sentence*

The defendant committed his offenses in November 2005; thus, he was sentenced under the revised sentencing act as enacted by the Tennessee General Assembly in July 2005. The act provides:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
>> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2) (2006).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Id. § (d)-(f); State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. See id.

In imposing a sentence, the trial court may only consider enhancement factors that are "appropriate for the offense" and "not already . . . essential element[s] of the offense." Tenn. Code Ann. § 40-35-114 (2006). These limitations exclude enhancement factors "based on facts which are used to prove the offense" or "facts which establish the elements of the offense charged." State v. Jones, 883 S.W.2d 597, 601. Our supreme court has stated that "[t]he purpose of the limitations is to avoid enhancing the length of sentences based on factors the legislature took into consideration when establishing the range of punishment for the offense." State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997); Jones, 883 S.W.2d at 601.

At the sentencing hearing, the State proposed the following enhancement factors:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;
(2) The defendant was a leader in the commission of an offense involving two (2) or

more criminal actors;

(8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and

(13) At the time the felony was committed, one (1) of the following classifications was applicable to the defendant:

> (B) Released on parole.

Tenn. Code Ann. § 40-35-114(1)-(2), (8), (13)(B) (2006). Regarding mitigating factors, the defendant proposed two: "The defendant's criminal conduct neither caused nor threatened serious bodily injury," see id. § 40-35-113(1), and a provision in the especially aggravated kidnapping statute whereby "[i]f the offender voluntarily releases the victim alive . . . such actions shall be considered by the court as a mitigating factor at the time of sentencing," see id. § 39-13-305(b)(2). The trial court found that all of the State's proposed enhancement factors applied and gave great weight to enhancement factor (13)(B). The trial court found that the mitigating factor established in the especially aggravated kidnapping statute applied but that the "neither causing nor threatening serious bodily injury" factor did not apply. The trial court sentenced the defendant as a Range II offender to nineteen years for his aggravated robbery conviction, nine years for his conviction for conspiracy to commit aggravated robbery, and thirty-eight years for his especially aggravated kidnapping conviction.

Initially, we note that the defendant argues that the trial court's application of sentence enhancement factors (2), (8), and (13)(B) violated his Sixth Amendment right to a jury trial. The United States Supreme Court has repeatedly held that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" Blakely v. Washington, 542 U.S. 296, 301, 124 S. Ct. 2531, 2536 (2004) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000)). Furthermore, the Tennessee Supreme Court has held that our former sentencing act, one establishing presumptive minimum sentences that required the trial court to enhance sentences based on facts not found by the jury, violated the Sixth Amendment as interpreted by Blakely and its progeny. Gomez II, 239 S.W.3d at 740-41 (citing Cunningham v. California, 549 U.S. 270, 275, 127 S. Ct. 856, 860 (2007)). However, Tennessee's revised sentencing act, which applies to the defendant's sentences in this case, is one in which "[i]mposition of a 'presumptive sentence' in the absence of enhancing and mitigating factors is no longer mandatory." Gomez II, 239 S.W.3d at 740 n.8 (citing Tenn. Code Ann. § 40-35-210(c)). The Supreme Court has held that systems such as Tennessee's "permit judges genuinely 'to exercise broad discretion . . . within a statutory range'" and "encounter[] no Sixth Amendment shoal." Cunningham, 1594 U.S. at 294 (citing United States v. Booker, 543 U.S. 220, 233, 125 S. Ct. 738, 750 (2005)). As such, the defendant's Sixth Amendment-based argument regarding his sentences is without merit.

In this case, the sentences imposed by the trial court were within the statutorily-prescribed range. See Tenn. Code Ann. § 40-35-112(b)(1)-(3) (2006) (for defendant convicted as a Range II offender, sentence range for Class A felony is twenty-five to forty years; for Class B felony, twelve to twenty years; for Class C felony, six to ten years). Regarding the enhancement factors, the presentence report details that the defendant had an extensive history of previous convictions,

including a 1984 armed robbery conviction for which he was on parole at the time of the instant offenses, a 1972 armed robbery conviction, and numerous misdemeanor convictions for offenses including assault, disorderly conduct, vandalism, and theft. The record also supports application of the "leader in the commission of a felony involving two or more actors," as the defendant enlisted Josh Irvin's assistance in robbing the Lone Star restaurant. The record reflects that the trial court, as required by statute, considered both mitigating factors proposed by the defendant. The trial court applied only one of the mitigators, as was within its discretion. Because the record supports the trial court's application of enhancement factors, and because the defendant's sentences were within the appropriate ranges, we conclude that the sentences imposed by the trial court reflected an appropriate exercise of the trial court's discretion, and we will not disturb the sentences on appeal. See Carter, 254 S.W.3d at 346. The defendant is denied relief on this issue.

*Consecutive Sentencing*

The trial court ordered that the defendant's three sentences in this case be served consecutively to each other, resulting in a total sentence of sixty-six years. The trial court also ordered that these sentences be served consecutively to his life sentence for a previous armed robbery conviction, a sentence for which he was on parole at the time he committed these offenses. See Tenn. R. Crim. P. 32(c)(3)(A). Regarding the previous conviction, the presentence report indicates that in 1984, the defendant was convicted of armed robbery and sentenced to life in prison. This court affirmed the defendant's conviction on appeal. See State v. Larry Pittman, C.C.A. No. 20, 1986 WL 4841 (Tenn. Crim. App. at Jackson, Apr. 23, 1986). The presentence report indicates that in March 2002 the defendant was granted parole, which was revoked in January 2006 following his arrest in this case. No order granting or revoking the defendant's parole appears in the record; however, despite this deficiency, the defendant does not attack the trial court's order that his sentences in this case be served consecutively to his sentence for armed robbery. As such, we will only address the defendant's contention that the trial court erred in ordering that his sentences in this case be served consecutively to each other.

The trial court ordered that the defendant's sentences in this case be served consecutively to each other based on the defendant's extensive criminal history and his status as a dangerous offender. See Tenn. Code Ann. § 40-35-115(b)(2), (4) (2006). Similarly, the defendant argues that the trial court's imposition of consecutive sentences violated his rights under the Sixth Amendment. However, the Tennessee Supreme Court has held that our statutory scheme, in which the trial court may impose consecutive sentences if it determines that certain statutory factors are established in the record by a preponderance of the evidence, does not offend a defendant's right to a jury trial under the Sixth and Fourteenth Amendments. See State v. Allen, 259 S.W.3d 671, 688-90 (Tenn. 2008).

The record reflects that the trial court explained in great detail how the record supported its findings that the defendant's extensive criminal record, detailed above, justified the imposition of consecutive sentences. Thus, the trial court's imposition of consecutive sentences based upon the defendant's criminal history was proper. Regarding the trial court's imposition of consecutive sentences based upon the defendant's status as a dangerous offender, our supreme court has held that when the trial court imposes consecutive sentences based on the defendant's dangerous offender status, the trial court must, "in addition to the application of general principles of sentencing," find

"that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). The record reflects that the trial court did not make the required Wilkerson findings on the record. However, only one factor is needed for the trial court to act within its discretion to impose consecutive sentences. See Tenn. Code Ann. § 40-35-115, Sentencing Comm'n Cmts. Accordingly, the defendant is not entitled to relief on this issue.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE